IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LORENZO QUINTANA,                )
on behalf of himself and all     )
others similarly situated,       )
                                 )
                Plaintiff,        )
                                 )
        v.                       )        1:18CV748
                                 )
BRANCH BANKING AND TRUST         )        **FILED UNDER SEAL**
COMPANY,                         )
                                 )
                Defendant.        )

### MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Presently before the court is the Motion for Partial Summary Judgment, (Doc. 60), filed by Plaintiff Lorenzo Quintana, as well as the Motion for Summary Judgment, (Doc. 68), filed by Defendant Branch Banking and Trust Company ("BB&T"). Plaintiff is suing BB&T on behalf of himself and all others similarly situated for violations of the Telephone Consumer Protection Act ("TCPA"). Parties each move for summary judgment on the issue of whether BB&T's predictive dialing software that was used to contact Plaintiff meets the statutory definition of an "automatic telephone dialing system" ("ATDS") under the TCPA. For the reasons stated herein, the court finds that BB&T's system does not meet the statutory definition of an ATDS under

the TCPA and will therefore grant Defendant's motion and deny Plaintiff's motion.[1]

# I. FACTUAL AND PROCEDURAL BACKGROUND

Though the parties interpret the statute differently, the relevant factual background for the present inquiry is undisputed.

## A. Factual Background

Plaintiff alleges, and Defendant does not contest, that on July 27, 2018, he received a call on his cellphone from the number (888) 765-1808. (Complaint ("Compl.") (Doc. 1) ¶¶ 29-30.) That number is a BB&T phone number, (Declaration of Joshua D.

---

[1] At the outset, the court notes that at least one other district court in this circuit has stayed a similar TCPA action pending the Supreme Court's decision in Am. Ass'n of Political Consultants, Inc. v. FCC, 923 F.3d 159 (4th Cir. 2019), cert. granted sub nom. Barr v. Am. Ass'n of Political Consultants, Inc., No. 19-631, 2020 WL 113070 (U.S. Jan. 10, 2020). See Boger v. Citrix Sys., Inc., Civil Action No. 8:19-cv-01234-PX, 2020 WL 1939702, at *4 (D. Md. Apr. 22, 2020). The parties in this case have not asked for a stay pending the Supreme Court's constitutional analysis of the TCPA, and this court finds such a stay would not be appropriate since the summary judgment issue herein is ripe for ruling. See Maryland v. Universal Elections, Inc., 729 F.3d 370, 379 (4th Cir. 2013); Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC, 141 F. Supp. 3d 428, 452 (M.D.N.C. 2015).

- 2 -

Arisohn ("Arisohn Decl.") (Doc. 66) at 125),[2],[3] but Plaintiff is not and never has been a BB&T customer, (Compl. (Doc. 1) ¶ 29).

BB&T call centers utilize the Outbound Contact Manager and server from Genesys Telecommunications Laboratories (the "Genesys system"). (Arisohn Decl. (Doc. 66) at 125; Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Br.") (Doc. 69), Affidavit of Bobby Taylor ("Taylor Aff.") (Doc. 69-4) ¶ 2.) BB&T did not alter the Genesys system in any way when it was installed at their call centers. (Arisohn Decl. (Doc. 66) at 165; Def.'s Br. (Doc. 69) Ex. A, Deposition of Bobby Taylor ("Taylor Dep.") (Doc. 69-1) at 3.) The Genesys system was used to call Plaintiff. (Arisohn Decl. (Doc. 66) at 126; Taylor Aff. (Doc. 69-4) ¶ 6.)

The Genesys system has a "predictive dialing" mode. (Arisohn Decl. (Doc. 66) at 39.) Predictive dialers are software programs that "anticipate when an agent (currently engaged in a telephone call) will become available and as a result begin

_____

[2] Though entitled as the "Declaration of Joshua D. Arisohn," one of Plaintiff's attorneys, Docket 66 is a collection of Plaintiff's evidence in support of his motion. This court cites documents by CM/ECF Docket Entry and will not differentiate within this document, but the declaration includes deposition excerpts and technical manuals for the Genesys system.

[3] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

dialing the 'next' call (before an agent is actually
available)." (Declaration of Benedict Occhiogrosso
("Occhiogrosso Decl.") (Doc. 67) ¶ 27.) "In a predictive dialing
mode the Genesys Outbound will predict agent availability and
dial accordingly." (Arisohn Decl. (Doc. 66) at 39.) A
"[p]redictive dialer gets its list from some source; and then
based on a set of rules that a user puts in place, executes
commands to a network to place calls." (Id. at 152.)

Generally speaking, the Genesys system works as follows.
First, the collection department at BB&T creates a list of phone
numbers linked to accounts that need to be contacted.
(Occhiogrosso Decl. (Doc. 67) ¶¶ 36, 44.) This data is created
automatically by BB&T's Recovery Management System ("RMS").
(Arisohn Decl. (Doc. 66) at 128-30.) The RMS is BB&T's account
database that lists account holder information, including phone
numbers. (Id. at 128.) The RMS generates a ".raw" file that
contains phone numbers for the call campaigns. (Id. at 129, 166;
Taylor Dep. (Doc. 69-1) at 6.) The .raw files are converted to a
database that the Genesys system can read and are then
transferred over "Connect Direct," a BB&T intranet system
separate from the Genesys system. (Def.'s Br. (Doc. 69) Ex. B,
Deposition of Joseph Joyner ("Joyner Dep.") (Doc. 69-2) at 5;
Arisohn Decl. (Doc. 66) at 167.)

- 4 -

The Genesys system is dependent on these external files since it cannot generate its own numbers to dial. The Outbound Contact Server ("OCS") does not have the ability to randomly generate numbers to dial, but instead manages call campaigns based on preloaded lists of numbers. (See Arisohn Decl. (Doc. 66) at 38, 152, 155.) Once a list of numbers is sent to the OCS, the OCS stores the list for dialing. (Id. at 156.)

Mr. John Tallarico, Genesys' Vice President of Product Management, (Def.'s Br. (Doc. 69), Expert Report of Jan Kostyun ("Kostyun Report") (Doc. 69-7) ¶ 33), gave the following statements at his deposition:

> Q:   . . . So does the system or any component of the system have the ability to generate telephone numbers on its own either randomly or sequential and then dial those numbers?
>
>      . . . .[4]
>
> A:   It does not.
>
> Q:   So there's no setting configuration, button or anything else on the system that a user can access in order to generate telephone numbers on its own?
>
>      . . . .
>
> A:   Correct.

---

[4] Plaintiff's counsel Andrew J. Obergfell objected to the form of both questions. Counsel objected to the first question on the grounds that it called for a legal conclusion. Counsel did not elaborate on the grounds for his second objection. Plaintiff has not provided further argument or clarification for these objections. In the absence of any arguments, the court finds no reason this testimony is inadmissible.

- 5 -

Q:  Okay. So the only way the system can dial telephone numbers is if it's provided a calling list?

A:  Correct.

(Def.'s Br. (Doc. 69), Ex. C, Deposition of John Tallarico ("Tallarico Dep.") (Doc. 69-3) at 9–10). Genesys system consumers, such as BB&T, do not have the capacity to alter the software to generate numbers. (Id. at 11.) Accordingly, Mr. Joyner, an Application and Data Services Distinguished Technologist at BB&T who works with the dialing systems, stated that the Genesys system does not have the capacity to randomly or sequentially generate and dial numbers, nor does BB&T "call people at random." (Declaration of Joseph Joyner ("Joyner Decl.") (Doc. 69-5) ¶¶ 1, 7.)

The .raw files that contain account phone numbers are transferred over BB&T systems to the Genesys system's database server where they are stored until the next day's call campaigns. (Arisohn Decl. (Doc. 66) at 166–70.) These .raw files from RMS, now broken down into "calling lists," can be further filtered by an associate using the Genesys system. (Id. at 21; Taylor Dep. (Doc. 69-1) at 7–8.) Calling lists can be "filtered" to create lists based on amount owed, the order of the phone numbers themselves, or alphabetically by name. (Taylor Dep. (Doc. 69-1) at 10.) The numbers in a list cannot be put in a random order, (id.), and the Genesys system cannot alter the

- 6 -

order as prescribed by the system user, (Tallarico Dep. (Doc. 69-3) at 12).

An administrator initiates a "campaign" based on the .raw files generated by the RMS. (Arisohn Decl. (Doc. 66) at 132–36; Occhiogrosso Decl. (Doc. 67) ¶¶ 36–37.) A "campaign" is a "master plan for managing customer data, generating calls, and monitoring and handling call results." (Arisohn Decl. (Doc. 66) at 21.) Once the administrator initiates the campaign, the Genesys system takes over calling the numbers; human intervention is only required to initiate the campaign. (Occhiogrosso Decl. (Doc. 67) ¶ 37; Arisohn Decl. (Doc. 66) at 135–38.) If there is a dialing port available and the predictive dialing software predicts an associate will be available, the OCM's predictive dialing software selects the next number to be dialed and sends a message to the SIP[5] Server to place the call. (Taylor Dep. (Doc. 69-1) at 11; Joyner Dep. (Doc. 69-2) at 8.) The SIP Server then sends a message to BB&T's phone carrier to make the call. (Arisohn Decl. (Doc. 66) at 28, 138.) Other software within the OCM detects whether the call is answered; if it is, the system connects the call to an available operator. (Joyner Dep. (Doc. 69-2) at 12–13.)

---

[5] "SIP" is short for "session initiation protocol." (Occhiogrosso Decl. (Doc. 67) ¶ 18.)

Case 1:18-cv-00748-WO-JLW   Document 84   Filed 06/11/20   Page 7 of 37

## B. **Expert Analysis**

The parties each offer expert opinions, but the opinions are not contradictory.

Plaintiff's expert claims the Genesys system qualifies as a "predictive dialer" because it "predicts agent availability when it dials calls from a calling list." (Occhiogrosso Decl. (Doc. 67) ¶ 43.) Plaintiff's expert witness stated that, in his opinion, the Genesys system that was used to call Plaintiff "has the present capacity to (1) operate as a predictive dialer and (2) store a list of numbers to be called and to then dial them." (Id. ¶ 3.) The predictive dialing function on the Genesys system is used by BB&T agents in "high volume campaigns where the rate of connection to live call recipients is expected to be low." (Id. ¶ 35.)

While not contesting the conclusion that the Genesys system is a "predictive dialer," Defendant's expert concludes that the Genesys system did "NOT have the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers. The Genesys dialer cannot create telephone numbers sequentially or randomly and then dial those numbers." (Kostyun Report (Doc. 69-7) ¶ 15.) "All telephone numbers dialed by the dialer must be uploaded to the Genesys dialer, and more specifically the Outbound Contact platform." (Id. ¶ 21.) Mr. Kostyun points out that none of the

- 8 -

technical specifications for the Genesys system describe any capacity to generate numbers randomly or sequentially. (Id. ¶ 28.) Mr. Kostyun also noted that random calls cut against BB&T's stated purpose for making the calls in the first place. (Id. ¶¶ 38–40.)

### C.  Procedural Background

Plaintiff filed this putative class action on behalf of himself and all similarly situated individuals. (Compl. (Doc. 1) at 1.) Plaintiff brings two causes of action against BB&T: (1) Knowing and/or Willful Violations of the Telephone Consumer Protection Act (id. ¶¶ 60–64); and (2) Violations of the Telephone Consumer Protection Act. (Id. ¶¶ 65–69.)

BB&T subsequently filed three motions: (1) a Motion to Dismiss for Failure to State a Claim, (Doc. 12); (2) a Motion to Stay the proceedings pending a possible administrative decision by the Federal Communications Commission ("FCC"), (Doc. 13); and (3) a Motion to Strike Class Allegations, (Doc. 14). On July 10, 2019, the court held a hearing, during which it issued an oral order denying all three motions. (See Minute Entry 07/10/2019; Oral Order). The Motions to Stay, (Doc. 13), and to Strike Class Allegations, (Doc. 14), were denied without prejudice, (Minute Entry 07/10/2019). The case was bifurcated, with the first phase focusing on the ATDS issue. (See Doc. 48 at 1; Doc. 49 at 1.) Defendant filed an Answer to the Complaint. (Doc. 55.)

- 9 -

The first phase of discovery on the ATDS issue is complete, and the parties have filed cross-motions for summary judgment on the ATDS issue. Plaintiff filed a Motion for Partial Summary Judgment on the ATDS issue, (Doc. 60), as well as a supporting brief, (Pl.'s Mem. of Law in Supp. of Mot. for Partial Summ. J. ("Pl.'s Br.") (Doc. 65)). Defendant responded, (Doc. 74), and Plaintiff replied, (Pl.'s Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.'s Reply") (Doc. 76)). Defendant also filed a Motion for Summary Judgment on the ATDS issue, (Doc. 68), as well as a supporting brief, (Def.'s Br. (Doc. 69)). Plaintiff responded, (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") (Doc. 72)), and Defendant replied, (Doc. 75).

In conjunction with his Motion for Partial Summary Judgment, Plaintiff also filed a Motion to Seal, (Doc. 64.) Defendant responded in support of Plaintiff's Motion to Seal. (Doc. 70.) Plaintiff did not reply.

Both motions for summary judgment, (Docs. 60, 68), as well as Plaintiff's Motion to Seal, (Doc. 64), are now ripe for ruling. The court finds that Plaintiff's Partial Motion for Summary Judgment should be denied, and that Defendant's Motion for Summary Judgment should be granted.

The court will direct that this opinion be initially filed under seal until the parties have an opportunity to offer

- 10 -

redactions where needed. After the specific redactions are offered, the court will address the Motion to Seal. (Doc. 64.)

## II. __STANDARD OF REVIEW__

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). "[T]he interpretation of a statute is a question of law." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 876 (4th Cir. 1992); see also Broughman v. Carver, 624 F.3d 670, 674 (4th Cir. 2010) ("[A] question of statutory interpretation, [is] a quintessential question of law . . . ." (quoting United States v. Joshua, 607 F.3d 379, 382 (4th Cir. 2010))). When a "dispute ultimately turns entirely on a question of statutory interpretation, the district court . . . [may] resolve the case on summary judgment." United States v. West Virginia, 339 F.3d 212, 214 (4th Cir. 2003); see also Vill. of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 634–35 (1980); Stevenson v. Mitchell, Civil Action No. 1:10-cv-2673-RMG, 2011 WL 3626605, at *1 (D.S.C. Aug. 17, 2011); United States v. Williams, Criminal Case No. 2:07cr185, 2007 WL 4411494, at *2 (E.D. Va. Dec. 13,

2007); <u>Purdy v. Town of Greenburgh</u>, 248 F. Supp. 2d 266, 268 (S.D.N.Y. 2003).

When facing cross-motions for summary judgement, this court reviews "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523 (4th Cir. 2003) (citations and internal quotation marks omitted). "When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." <u>Id.</u> (citation and internal quotation marks omitted).

## III.  <u>ANALYSIS</u>

This court's present inquiry is focused on whether the Genesys system meets the statutory definition of an ATDS. The material facts on that point are not in dispute, and the court addresses both motions in this analysis.

First, the parties agree that the Genesys system has a predictive dialing mode that is able to automatically dial a large volume of calls by predicting when a BB&T associate will be available. (<u>Compare</u> Pl.'s Br. (Doc. 65) at 8, <u>with</u> Def.'s Br. (Doc. 69) at 9.) Second, the parties do not dispute that the Genesys system has the capacity to store lists of telephone numbers. (<u>Compare</u> Pl.'s Br. (Doc. 65) at 10, <u>with</u> Def.'s Br.

- 12 -

(Doc. 69) at 8-9.) Third, the parties do not dispute that the Genesys system is not capable of generating numbers to dial, but is instead reliant on outside sources for the calling lists. (Compare Pl.'s Br. (Doc. 65) at 18-19, with Def.'s Br. (Doc. 69) at 8-9.) Finally, the parties do not dispute that the Genesys system called Plaintiff's cellular telephone while in predictive dialing mode. (Compl. (Doc. 1) ¶ 30; Def.'s Br. (Doc. 69) at 9.) The factual record supports these points of agreement.

In sum, the parties do not disagree about the nature or attributes of the Genesys system or that it was used to call Plaintiff. The parties only disagree about whether the Genesys system is captured by 47 U.S.C. § 227(a)(1)'s definition of an ATDS. This question is one of law that is appropriate for resolution on summary judgment. West Virginia, 339 F.3d at 214.

Subject to certain exceptions discussed infra, the TCPA makes it illegal to use an ATDS to call "any telephone number assigned to a . . . cellular telephone service . . . ." 47 U.S.C. § 227(b)(1)(A)(iii). "The term 'automatic telephone dialing system' means equipment which has the capacity--(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." Id. § 227(a)(1).

Under the TCPA, the FCC "shall prescribe regulations to implement the requirements of this subsection." 47 U.S.C.

- 13 -

§ 227(b)(2). The FCC issued several orders interpreting the statutory definition of ATDSs as it pertained to predictive dialers. In 2003, the FCC concluded that "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 FCC Rcd. 14014, 14093 (2003). In 2008, the FCC "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 23 FCC Rcd. 559, 566 (2008).[6] In 2015, the FCC issued another declaratory ruling regarding the definition of an ATDS. In the 2015 order, "[t]he Commission reaffirmed prior orders deciding that 'predictive dialers' — equipment that can dial automatically from a given list of telephone numbers using algorithms to predict 'when a sales agent will be available' — qualify as autodialers." ACA Int'l v. FCC, 885 F.3d 687, 694

---

[6] Though not mentioned by the ACA International court, the FCC also issued an order in 2012 dealing with text messages and the TCPA. In that order, the FCC noted that the definition of an ATDS "covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 FCC Rcd. 15391, 15392 n.5 (2012).

(D.C. Cir. 2018). That 2015 declaratory ruling was challenged in ACA International v. Federal Communications Commission.

Analyzing the 2015 order, the ACA International court concluded that the FCC had not "engaged in reasoned decisionmaking" as it pertained to the "explanation of which devices qualify as an ATDS . . . ." Id. at 695 (quoting Judulang v. Holder, 565 U.S. 42, 53 (2011)). The court found that the FCC's 2015 order espoused two "competing interpretations": that ATDSs must have the capacity to generate random and sequential numbers, and that an ATDS need not have such capacity. Id. at 702–03. The court concluded that the FCC "might . . . adopt either interpretation," but it "cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order." Id. at 703.

The ACA International court specifically overturned the FCC's 2015 declaratory order. However, since ACA International, courts are divided over the effect of that decision on the 2003 and 2008 orders. See Stanley v. Capital One Fin. Corp., Civil Action No. 7:19-CV-00337, 2020 WL 104679, at *1 (W.D. Va. Jan. 8, 2020) ("Since 2018, courts remain split regarding the proper definition of an ATDS.").

The two principle issues for this court are: (1) whether ACA International overturned the 2003 and 2008 FCC orders; and (2) whether the statute reaches predictive dialers without the

- 15 -

capacity to generate numbers. The court begins with the first issue, whether the 2003 and 2008 FCC Orders are still in effect.

## A.   ACA International and the 2003/2008 FCC Orders[7]

The first question for this court is whether the ACA International decision overturned the 2003 and 2008 FCC orders in addition to the 2015 order. If so, that decision is binding on this court. GTE South, Inc. v. Morrison, 199 F.3d 733, 743 (4th Cir. 1999). This court finds that ACA International does reach the 2003 and 2008 orders. There are two parts of the ACA International decision that support a conclusion that the D.C. Circuit was addressing all three orders. First is that court's reasoning justifying its jurisdiction. Second is that court's reasoning regarding the confusion created by not only the 2015 order, but also the 2003 and 2008 orders.

First is the ACA International court's reasoning supporting its jurisdiction. In ACA International, the FCC argued that the D.C. Circuit lacked jurisdiction to address its previous orders declaring that predictive dialers qualified as ATDSs. ACA Int'l, 885 F.3d at 701. The FCC argued that since the 2003 and 2008 orders were no longer appealable, the predictive dialer issue was closed to appeal. Id. Though the 2015 order "purport[ed] to

---

[7] The ACA International court referred to the orders as "declaratory rulings" and "orders." ACA Int'l, 885 F.3d at 693. This court will refer to them as "orders."

reaffirm the prior orders," the court found that fact did not "shield the agency's pertinent pronouncements from review." Id. at 701. The court noted that the original petitioners in ACA International petitioned the FCC both for a clarifying ruling and new rulemaking, meaning the 2015 order was "reviewable on both grounds." Id.

In support of this conclusion, the ACA International court then cited Biggerstaff v. FCC, 511 F.3d 178, 184–85 (D.C. Cir. 2007). Id. As stated in the cited portions of Biggerstaff, an "agency's reconsideration of a rule in a new rulemaking constitutes a reopening when the original rule is 'reinstated' so as to have renewed effect." Biggerstaff, 511 F.3d at 185 (citing Pub. Citizen v. Nuclear Regulatory Comm'n, 901 F.2d 147, 152 (D.C. Cir. 1990)). Biggerstaff court justified this position by explaining that

> In Ohio v. EPA, 838 F.2d 1325 (D.C. Cir. 1988), the court determined that it could review the validity of a rule promulgated three years before the challenged rule because "the period for seeking judicial review may be made to run anew when the agency in question by some new promulgation creates the opportunity for renewed comment and objection," id. at 1328. The court relied on Montana v. Clark, 749 F.2d 740 (D.C. Cir. 1984), which held that the "time for seeking review ran anew from the time of re-promulgation because the agency 'held out [a provision in a prior rule] as a proposed regulation, offered an explanation for its language, solicited comments on its substance, and responded to the comments in promulgating the regulation in its final form.'" Ohio v. EPA, 838 F.2d at 1328 (quoting Montana v. Clark, 749 F.2d at 744). Thus, an official reinterpretation of an old rule that

- 17 -

creates a new opportunity to challenge the
continuation of that rule triggers reopening. See
General Motors Corp. v. EPA, 363 F.3d 442, 449–50
(D.C. Cir. 2004).

Id. at 185.

With Biggerstaff's jurisdictional reasoning as support, the

ACA International court, as summarized by the Ninth Circuit,

"concluded that the parties' 2015 rulemaking petition to the FCC

reopened consideration of the definition of ATDS established in

the FCC's 2003 order, as well as its subsequent rulings." Marks

v. Crunch San Diego, LLC, 904 F.3d 1041, 1047 (9th Cir. 2018),

cert. dismissed, ____ U.S. ____, 139 S. Ct. 1289 (2019). Having

established its jurisdiction to address the 2003 and 2008

orders, the ACA International court then concluded that it must

"set aside the Commission's treatment of those matters," in

light of the "lack of clarity about which functions qualify a

device as an autodialer." ACA Int'l, 885 F.3d at 703.

The second part of the ACA International decision that

suggests it reaches the 2003 and 2008 orders is the language

linking the confusion in the 2015 order to the previous orders.

See Snow v. Gen. Elec. Co., No. 5:18-CV-511-FL, 2019 WL 2500407,

at *6 (E.D.N.C. June 14, 2019), appeal dismissed, No. 19-1724,

2019 WL 7500455 (4th Cir. Dec. 30, 2019) (noting such a

connection). As stated by the ACA International court,

While the 2015 ruling indicates in certain places
that a device must be able to generate and dial random

- 18 -

> or sequential numbers to meet the TCPA's definition of
> an autodialer, it also suggests a competing view: that
> equipment can meet the statutory definition even if it
> lacks that capacity. The Commission reaffirmed its
> 2003 ruling insofar as that order had found predictive
> dialers to qualify as ATDSs. And in the 2003 order,
> the Commission had made clear that, while some
> predictive dialers cannot be programmed to generate
> random or sequential phone numbers, they still satisfy
> the statutory definition of an ATDS. By reaffirming
> that conclusion in its 2015 ruling, the Commission
> supported the notion that a device can be considered
> an autodialer even if it has no capacity itself to
> generate random or sequential numbers (and instead can
> only dial from an externally supplied set of numbers).

ACA Int'l, 885 F.3d at 702. Furthermore, the ACA International court found that even the previous orders failed to provide clarity; the 2015 order reaffirmed the position of its 2003 and 2008 orders, orders that themselves "left significant uncertainty about the precise functions an autodialer must have the capacity to perform." Id. at 701; see also Wilson v. PL Phase One Operations L.P., 422 F. Supp. 3d 971, 983 (D. Md. 2019) ("The decision of the United States Court of Appeals for the District of Columbia Circuit in ACA International held that a past FCC ruling — not the [TCPA] — generated uncertainty, and it vacated the rulings that were the source of confusion." (emphasis added)).

Given ACA International's jurisdictional reasoning and language linking the orders together, several circuit courts have concluded that the decision vacated the 2003, 2008, and 2015 FCC orders. The Fourth Circuit has not addressed the effect

- 19 -

of ACA International, but the Seventh, Ninth, and Eleventh Circuits have all concluded that ACA International overturned the 2003 and 2008 FCC orders. Gadelhak v. AT&T Servs., Inc., 950 F.3d 458, 463 (7th Cir. 2020) ("ACA International did not leave prior FCC Orders intact. Instead, the D.C. Circuit clarified that its review also covered 'the agency's pertinent pronouncements' — its prior Orders."); Glasser v. Hilton Grand Vacations Co., 948 F.3d 1301, 1310 (11th Cir. 2020) ("But [the appellants] do not come to grips with the reality that the D.C. Circuit, in a Hobbs Act proceeding of its own, wiped the slate clean."); Marks, 904 F.3d at 1047.[8],[9] Only the Second Circuit has

_____

[8] There is some dispute about whether the Third Circuit's decision in Dominguez v. Yahoo, Inc., 894 F.3d 116 (3d Cir. 2018), reached so far. Somogyi v. Freedom Mortg. Corp., Civil Action No. 17-6546 (JBS/JS), 2018 WL 3656158, at *4 (D.N.J. Aug. 2, 2018). As the court in Somogyi pointed out, the Third Circuit concluded that ACA International meant the court had to interpret the TCPA as it did prior to the 2015 FCC order, but did not make any determination about the previous orders. Id. at *4 n.4. Other courts have cited Dominguez as support for the conclusion that ACA International did overturn all previous orders. See Gadelhak, 950 F.3d at 463; Glasser, 948 F.3d at 1310. Though the reasoning in Glasser and Gadelhak appears sound, Dominguez's own language leaves open the possibility that the previous orders were still in effect. This court finds it unnecessary draw any conclusions regarding the Third Circuit's position on the effect of ACA International on the FCC's 2003/2008 orders.

[9] In addition to these circuit decisions, numerous district courts have also reached the same conclusion, to include two district courts in this circuit. See, e.g., Wilson, 422 F. Supp. 3d at 983; Snow, 2019 WL 2500407, at *6.

concluded that ACA International left the prior FCC orders intact. Duran v. La Boom Disco, Inc., 955 F.3d 279, 286 (2d Cir. 2020).

This court concludes, like the Seventh, Ninth, and Eleventh Circuits, that ACA International did overturn the FCC's 2003 and 2008 orders. As pointed out by the Ninth Circuit, ACA International's reliance on Biggerstaff indicates that the court was reviewing the FCC's rule about predictive dialers since it was being reinstated in a new order. See Marks, 904 F.3d at 1047. The ACA International court justified its jurisdiction to review the predictive dialer order by finding that rulemaking on the predictive dialer issue was reopened in the 2015 order. Further, though the court stated that the FCC might permissibly conclude that predictive dialers are included in the ATDS definition, it had yet to do so since it had failed to engage in "reasoned decisionmaking" in the 2003, 2008, or 2015 orders. See ACA Int'l, 885 F.3d at 703.

"Because the D.C. Circuit vacated the FCC's interpretation of what sort of device qualified as an ATDS, only the statutory definition of ATDS as set forth by Congress in 1991 remains. Accordingly, we must begin anew to consider the definition of

- 21 -

ATDS under the TCPA." <u>Marks</u>, 904 F.3d at 1049–50; <u>see also</u> <u>GTE</u> <u>South, Inc.</u>, 199 F.3d at 743.[10]

## B. <u>Statutory Interpretation</u>

Turning to the interpretation of the statute itself, the interpretative task is reduced to determining "what the phrase 'using a random or sequential number generator' modifies." <u>Gadelhak</u>, 950 F.3d at 460; <u>Glasser</u>, 948 F.3d at 1306 ("The first question is what to do with the clause: 'using a random or sequential number generator.' Does it modify both verbs ('to store' and '[to] produce') or just one of them ('[to] produce' but not 'to store')?"). If the phrase modifies both "store" and "produce," then the Genesys system does not qualify as an ATDS.

---

[10] Having found <u>ACA International</u> overturned the previous orders, it is unnecessary for the court to address the Supreme Court's recent decision in <u>PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.</u>, 588 U.S. ___, 139 S. Ct. 2051 (2019). The court notes that <u>PDR Network</u> does suggest that district courts, under certain circumstances, are not automatically bound by the interpretative rulings of the FCC. <u>Id.</u> at 2055. Plaintiff contends the FCC's ruling about predictive dialers is not interpretive, but legislative. (Pl.'s Reply (Doc. 76) at 7.) But again, the court need not resolve the issue here. The court also need not resolve whether these overturned interpretations should be given <u>Chevron</u> deference, as Plaintiff argues they are. (Pl.'s Resp. (Doc. 72) at 10–11.)

If the phrase modifies only "produce" or neither "store" or "produce," then the Genesys system does qualify as an ATDS.[11]

"The starting point for any issue of statutory interpretation . . . is the language of the statute itself." United States v. Bly, 510 F.3d 453, 460 (4th Cir. 2007). "In that regard, we must first determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute . . . and our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." Id. (quoting United States v. Hayes, 482 F.3d 749, 752 (4th Cir. 2007)). It is also a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." FDA v. Brown & Williamson Tobacco

---

[11] If we read the statute to mean that, in order for a program to qualify as an ATDS, the phone numbers it calls must be stored using a random- or sequential-number-generator or produced using a random- or sequential-number-generator, then we must conclude that [the] programs are not ATDSs, since the programs called numbers stored in a human-generated list. But if we read the statute to mean that, in order for a program to qualify as an ATDS, the phone numbers it calls must be either stored in any way or produced using a random- or sequential-number-generator, then we must conclude that the programs here can qualify as ATDSs.

Duran, 955 F.3d at 284.

Corp., 529 U.S. 120, 133 (2000) (quoting Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989)).[12]

Only in "exceptional circumstances" should a court look to anything other than the statutory text, such as when:

> "a literal reading of [the] statute [will] produce a result 'demonstrably at odds with the intentions of its drafters,'" United States v. Locke, 471 U.S. 84, 93, 105 S. Ct. 1785, 1792, 85 L. Ed. 2d 64 (1985), or "'where acceptance of that meaning would lead to absurd results . . . or would thwart the obvious purpose of the statute,'" Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643, 98 S. Ct. 2053, 2061, 56 L. Ed. 2d 591 (1978), citing Commissioner v. Brown, 380 U.S. 563, 571, 85 S. Ct. 1162, 1166, 14 L. Ed. 2d 75 (1965), or where "an absolutely literal reading of a statutory provision is irreconcilably at war with the clear congressional purpose, [in which case] a less literal construction . . . [may] be considered." United States v. Campos-Serrano, 404 U.S. 293, 298, 92 S. Ct. 471, 474, 30 L. Ed. 2d 457 (1971).

United States v. Morison, 844 F.2d 1057, 1064 (4th Cir. 1988).

The court begins by discussing the two widely accepted interpretations based only on the statute's language and

---

[12] Both the Seventh and Eleventh Circuits have similar statutory interpretation standards. See Ga. State Conference of the NAACP v. City of LaGrange, 940 F.3d 627, 631 (11th Cir. 2019); United States v. Berkos, 543 F.3d 392, 396 (7th Cir. 2008). As discussed infra, these circuits' interpretation of 47 U.S.C. § 227(a)(1) is persuasive.

Case 1:18-cv-00748-WO-JLW   Document 84   Filed 06/11/20   Page 24 of 37

structure.[13] The court then turns to the discussion of the broader statutory context.

### 1.   **The Competing Interpretations**

The court begins with the interpretation it finds best comports with the language and structure of the provision: that both "store" and "produce" are modified by "using a random or sequential number generator" ("generator clause"). This is an interpretation adopted by the Seventh and Eleventh Circuits. See Gadelhak, 950 F.3d at 460; Glasser, 948 F.3d at 1306.

"Start with conventional rules of grammar and punctuation. When two conjoined verbs ('to store or produce') share a direct object ('telephone numbers to be called'), a modifier following that object ('using a random or sequential number generator') customarily modifies both verbs." Glasser, 948 F.3d at 1306. "The placement of the comma before 'using a random or sequential number generator' in the statute further suggests that the modifier is meant to apply to the entire preceding clause." Gadelhak, 950 F.3d at 464. "On top of that, the sentence contains a comma separating the phrase 'to store or produce telephone numbers to be called' from the phrase 'using a random

---

[13] Of course, there are more than two possible interpretations, but only the two discussed in this opinion have been widely accepted, and the court is not convinced by other interpretations. See Gadelhak, 950 F.3d at 463.

or sequential number generator.' That, too, indicates that the clause modifies both 'store' and 'produce' and does not modify just the second verb." Glasser, 948 F.3d at 1307. The grammatical structure thus supports a conclusion that "using a random or sequential number generator" modifies both "store" and "produce."

The second interpretation, as adopted by the Second and Ninth Circuits, concludes that "using a random or sequential number generator" modifies only "produce" and not "store." See Duran, 955 F.3d at 284; Marks, 904 F.3d at 1051. Both courts, however, reached their conclusions without engaging in the same detailed grammatical analysis conducted by the Glasser and Gadelhak courts. As described by the Seventh Circuit, the second approach also rewrites the language of the statute by refusing to apply the modifying phrase in a grammatically correct way.

> It would be unnatural . . . to splice "store" and "produce" to have the final phrase, "using a random or sequential number generator," modify only the latter verb. [Plaintiff] asks us to reorder the sentence to separate "store" and "produce" but to clarify that

"telephone numbers" is the object of both. That would be a significant judicial rewrite.[14]

Gadelhak, 950 F.3d at 466. This court agrees with the reasoning of the Seventh and Eleventh Circuits. See Snow, 2019 WL 2500407, at *6 (disagreeing with the reasoning in Marks).

Though this court finds that the plain language and structure of the provision support an interpretation where "using a random or sequential number generator" modifies both "store" and "produce," the divergent conclusions of other courts reveal that the language is fairly open to at least one other interpretation. However, the language is not so ambiguous as to qualify as an "exceptional circumstance" justifying a "less literal construction." Morison, 844 F.2d at 1064. The court will still briefly consider the challenges to its interpretation as well as the statutory context.

---

[14] The Glasser court explained it another way:

But [the second] approach creates problems of its own, as we have also shown. To adopt this reading, one must separate the statute's two verbs ("to store or produce"), place the verbs' shared object ("telephone numbers to be called") in between those verbs, then insert a copy of that shared object to the statute, this time after the now separate verb "to produce" to make clear that "using a random or sequential number generator" modifies only "to produce." That looks more like "surgery," in the words of [the defendant], than interpretation.

Glasser, 948 F.3d at 1311.

- 27 -

## 2. **Challenges and Statutory Context**

As pointed out by courts and parties adopting the interpretation of the provision where the generator clause modifies both "store" and "produce," such a reading does present some challenges. However, "[e]ach interpretation runs into hurdles. In the absence of an ideal option, [this court] pick[s] the better option — in this instance that the clause modifies both verbs." Glasser, 948 F.3d at 1306.

First among the challenges to the court's reading of the statute is that if "store" is modified by "using a random or sequential number generator," it is possibly nonsensical since it is not clear how a number generator works to store numbers. See, e.g., Duran, 955 F.3d at 284. "But this problem fades when one considers how automatic phone-dialing technology works and when one keeps in mind the goal of giving content to each word and phrase in the statute." Glasser, 948 F.3d at 1307. Devices that produce numbers to be called must store them at some point; "[i]n that way, a device 'stores' telephone numbers 'using' a random or sequential number generator because the device employs the number generator as part of the storage process." Id. "The record before the FCC reveals that at the time of the statute's enactment, devices existed with the capacity to generate random numbers and then store them in a file for a significant time before selecting them for dialing." Gadelhak, 950 F.3d at 465.

The second challenge is the possible "surplusage" issue that comes with the answer to the first challenge. "[I]f the Act had meant to capture random-generation devices defined by their storage capacities, it needn't have used the word 'store' at all. After all, such a device also necessarily can 'produce' numbers using a number generator, rendering the 'store' option in the statute superfluous." Id. But there are two reasons any possible surplusage issue does not defeat this court's interpretation. First, "[g]iven the range of storage capacities among telemarketing devices at the time of enactment, it is plausible that Congress chose some redundancy in order to cover 'the waterfront.'" Id. (quoting Glasser, 948 F.3d at 1307). With the ATDS technology that existed at the time of passage, "[s]ometimes storage would happen; sometimes it wouldn't," giving Congress reason to be redundant. Glasser, 948 F.3d at 1307. Second, "both interpretations on the table run into superfluity problems," and courts should choose the "least superfluous approach — one that acknowledges some redundancy between store and produce but does not read a key clause ('using a random or sequential number generator') out of the statute" by severing the generator clause from "store." Id.

"Notwithstanding the difficulties posed by this interpretation, [this court] thinks that the language bears it." Gadelhak, 950 F.3d at 465. Furthermore, and contrary to

- 29 -

Plaintiff's arguments, this court's interpretation does not clash with the broader statutory context.

Plaintiff argues that the structure and context of the TCPA support the conclusion that the capacity to store numbers is sufficient to qualify as an ATDS. (Pl.'s Br. (Doc. 65) at 21.) First, Plaintiff notes that the TCPA exempts calls made to persons who have consented to such calls, an exception Plaintiff argues requires ATDSs to dial from stored lists. (Id.) Second, Plaintiff points to the exception in § 227(b)(1)(A)(iii) that exempts calls made to collect Government debts, an exception that Plaintiff argues, "presumes a definition of an ATDS that includes equipment dialing from a list of individuals." (Id.) Finally, Plaintiff points to the TCPA's treble damages provision in § 227(b)(3) that punishes "willful and knowing" violations of the statute as evidence that the capacity to store numbers is sufficient under the definition. (Id. at 22.)

Each of these arguments have been rebutted persuasively by other courts, and each argument is unpersuasive in light of two observations. First is the fact that "it is possible to imagine a device that both has the capacity to generate numbers randomly or sequentially and can be programmed to avoid dialing certain numbers." Gadelhak, 950 F.3d at 466-67 (quoting Pinkus v. Sirius XM Radio, Inc., 319 F. Supp. 3d 927, 939 (N.D. Ill. 2018)); Glasser, 948 F.3d at 1312 ("The statute, moreover, applies to

devices that have the 'capacity' to identify randomly generated numbers; it does not require that capacity to be used in every covered call."). Second, there is an "alternative basis for liability" that keeps the TCPA's exceptions relevant regardless of whether an ATDS can call from programmed lists. "[Section] 227(b)(1) makes callers liable if they make calls 'using an automatic telephone dialing system or an artificial or prerecorded voice.' This alternative basis for liability covers every exemption the plaintiffs worry about." Glasser, 948 F.3d at 1311-12. In light of these two observations, Plaintiff's contextual arguments do not render this court's interpretation illogical. See Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 662 (4th Cir.), cert. denied, ____ U.S. ____, 140 S. Ct. 676 (2019) (discussing TCPA treble damages and noting that a violation could also be willful if a marketer uses a random number generating system with "indifference to ongoing violations and a conscious disregard for compliance with the law"); Thompson-Harbach v. USAA Fed. Sav. Bank, 359 F. Supp. 3d 606, 626 (N.D. Iowa 2019) ("Plaintiff's logic fails, however, because a device can both (1) have the capacity to generate numbers randomly or sequentially, and (2) can be programmed to avoid dialing certain numbers, including numbers that belong to customers who have not consented to receive calls from a particular company. A violation of the TCPA, therefore, would

- 31 -

not be a matter of coincidence, but, rather, would result from a company's failure to program an ATDS device correctly."); Pinkus, 319 F. Supp. 3d at 939. ("Whether a marketer has violated the TCPA . . . need not be a matter of coincidence; rather, violations would result from a marketer's failure (deliberate or otherwise) to program the device correctly.").

Outside the statutory context, Plaintiff also argues that Congress's 2015 amendment to the TCPA was made against the backdrop of the FCC's post-2003 orders that included predictive dialers in the definition of ATDSs. (Pl.'s Br. (Doc. 65) at 21–22.) However,

> Congressional failure to act does not necessarily reflect approval of the status quo. See Alexander v. Sandoval, 532 U.S. 275, 292 (2001). And in any event, the FCC's interpretation of the statute was hardly settled at the time of the congressional amendment — in 2015, the D.C. Circuit was already reviewing ACA International. It is therefore particularly difficult to attribute acquiescence to Congress's actions that year.

Gadelhak, 950 F.3d at 467. Furthermore, the "2015 amendment did not reenact § 227's definition of an auto-dialer; it added to § 227's liability provision — a change that has nothing to do with this debate." Glasser, 948 F.3d at 1310 (citing Pub. L. 114-74 § 301, 129 Stat 584 (2015)). "[Plaintiff's] rationale for choosing atextual interpretation[s] is therefore unpersuasive." Gadelhak, 950 F.3d at 467.

### 3. **Interpretation Conclusion**[15]

In conclusion, interpreting the statute to read "using a random or sequential number generator" as modifying both "store" and "produce" is supported by the language and structure of 47 U.S.C. § 227(a)(1)(A). That interpretation is not changed when the statutory structure or broader context is considered. This interpretation is supported by well-reasoned opinions from the Seventh and Eleventh Circuits, as well as the conclusions of many other district courts. See, e.g., Glasser, 948 F.3d at 1310 (collecting district court cases); Thompson-Harbach, 359 F. Supp. 3d at 625; Snow, 2019 WL 2500407, at *6. Since the court finds the generator clause modifies both "store" and "produce,"

---

[15] Finding that the plain language of the statute is not ambiguous on its face, the court declines to consider the statute's legislative history. See Morison, 844 F.2d at 1064; see also Gadelhak, 950 F.3d at 466 (finding, implicitly, that the statute was not ambiguous by referring only to the statutory text and no legislative history); Snow, 2019 WL 2500407, at *6 ("The statute unambiguously incorporates a 'random or sequential number generator' into the definition of an ATDS."). To the extent the legislative history is needed, it does not support Plaintiff's interpretation.

> If anything, the legislative history hurts
> [Plaintiff], as there is plenty of evidence that
> Congress wanted the statute to eradicate machines that
> dialed randomly or sequentially generated numbers.
> That indeed seems to have been the be-all and end-all
> of the law.

Glasser, 948 F.3d at 1311.

- 33 -

an ATDS must have the capacity to produce telephone numbers to
be called using a random number generator.

### C.  **Application to Genesys System**

Finding that 47 U.S.C. § 227(a)(1)(A) requires the capacity
to generate random or sequential numbers, the court concludes
that the Genesys system does not qualify as an ATDS. The Genesys
system does not have the capacity to generate any numbers, much
less lists of random or sequential numbers. The OCS is not
listed as having the ability to randomly generate numbers to
dial, but instead manages campaigns based on preloaded lists of
numbers. (Arisohn Decl. (Doc. 66) at 38.) The "[p]redictive
dialer gets its list from some source; and then based on a set
of rules that user puts in place, executes commands to a network
to place calls." (Id. at 152, 155.) The Genesys system is
dependent on BB&T's RMS for its lists of phone numbers. (Id. at
128–30; Occhiogrosso Decl. (Doc. 67) ¶¶ 36, 44.) The numbers in
a calling list cannot even be put in a random order once the
calling lists are uploaded, (Taylor Dep. (Doc. 69-1) at 10), and
the Genesys system cannot alter the order as prescribed by the
system user, (Tallarico Dep. (Doc. 69-3) at 12).

Mr. Tallarico, Genesys' Vice President of Product
Management, also confirmed that "there's no setting
configuration, button or anything else on the system that a user
can access in order to generate telephone numbers on its own[.]"

- 34 -

(Tallarico Dep. (Doc. 69-3) at 10.) Genesys system consumers, such as BB&T, do not have the capacity to alter the software to generate numbers. (Id. at 11.) The Genesys system does not have the capacity to randomly or sequentially generate and dial numbers, nor does BB&T "call people at random." (Joyner Decl. (Doc. 69-5) ¶¶ 1, 7.) Indeed, such random calls cut against BB&T's stated purpose for making the calls in the first place: to help collect outstanding debts. (Kostyun Report (Doc. 69-7) ¶¶ 38-40.)

"The Genesys dialer cannot create telephone numbers sequentially or randomly and then dial those numbers." (Id. ¶ 15.) "All telephone numbers dialed by the dialer must be uploaded to the Genesys dialer, and more specifically the Outbound Contact platform." (Id. ¶ 21.) Mr. Kostyun points out that none of the technical specifications for the Genesys system describe any capacity to generate numbers, randomly or sequentially. (Id. ¶ 28.)[16]

In sum, the Genesys System does not have the capacity "to store or produce telephone numbers to be called, using a random or sequential number generator." 47 U.S.C. § 227(a)(1)(A). Since it does not, it does not qualify as an ATDS within the meaning

---

[16] Again, Plaintiff's own expert does not contradict these conclusions by Defendant's expert, nor has Plaintiff put forward any other evidence contradicting these conclusions.

of the TCPA. Defendant is therefore entitled to judgment as a matter of law.

IV. <u>CONCLUSION</u>

For the foregoing reasons, this court finds that Defendant's Motion for Summary Judgment on the ATDS Issue, (Doc. 68), should be granted, and that Plaintiff's Motion for Partial Summary Judgment, (Doc. 60), should be denied.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56, (Doc. 68), is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment pursuant to Fed. R. Civ. P. 56(a), (Doc. 60), is **DENIED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED WITH PREJUDICE.**

 **IT IS FURTHER ORDERED** that this Memorandum Opinion and Order is **FILED UNDER SEAL** and the parties shall file, within ten days of the filing of this Opinion, a joint report identifying the information in the Opinion, if any, they contend should be redacted, along with an explanation of the basis for their proposed redactions and a draft of this Opinion with those proposed redactions. Because information contained herein will likely be considered confidential information by the parties, this Opinion shall remain sealed

- 36 -

until the parties have had an opportunity to submit their requested redactions.

A judgment reflecting this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 11th day of June, 2020.

_____
United States District Judge